FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

AUG 1 3 2025

GARY P. SERDAR
CLERK OF COURT
BY
DEPUTY CLERK

EDWARD P. SULLIVAN, Acting Chief
ALEXANDER GOTTFRIED, Trial Attorney (NY Bar No. 5490024)
BLAKE J. ELLISON, Trial Attorney (TX Bar No. 24117203)
Attorneys for the United States of America
U.S. Department of Justice, Criminal Division
Public Integrity Section
1301 New York Ave. NW
Washington, D.C. 20530
Telephone: 202-514-1412
Alexander.Gottfried@usdoj.gov
Blake.Ellison@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:24-cr-415 |
| Plaintiff, | |
| v. | STATEMENT OF OFFENSE |
| DAVID COLE, | |
| Defendant. | |

## STATEMENT OF OFFENSE

The United States of America (the "Government"), through its undersigned attorneys, respectfully submits the following Statement of Offense in the above-captioned case.

The following proffer of the Government's evidence is intended only to provide the Court with enough evidence to satisfy the mandate of Rule 11(b)(3) of the Federal Rules of Criminal Procedure. This proffer is not intended to be a disclosure of all the evidence available to the Government.

Had this matter gone to trial, the Government's evidence would have shown, beyond a reasonable doubt, the following facts.

## Background

1. DAVID COLE, the defendant, was a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), a federal law enforcement agency responsible for investigating, disrupting, and dismantling terrorist, transnational, and other criminal organizations, including those who engage in illegal narcotics trafficking.

2. COLE and fellow HSI Special Agent NICHOLAS KINDLE were assigned to the HSI Field Office in Salt Lake City, Utah, where they were responsible for investigating illegal narcotics trafficking, among other offenses.

3. COLE and KINDLE used their positions as Special Agents to wrongfully obtain illegal narcotics seized by HSI and other law enforcement agencies and then sold the illegal narcotics to drug dealers, including Confidential Informant 1 (CI-1), for their own personal enrichment.

4. In furtherance of, and to effect the objects of, the conspiracies to which the defendant is pleading guilty, the defendant and KINDLE committed and caused to be committed the following acts, among others,

## The Initiation of the Scheme

5. Beginning in or about 2021, COLE and KINDLE began acquiring alpha-pyrrolidinohexanophenone and N-Ethylhexedrone (a/k/a bath salts) for the purpose of illegally selling those bath salts in the District of Utah for the purpose of enriching themselves by illegal means.

6. COLE and KINDLE acquired these drugs using various ruses, including by stealing the drugs from HSI evidence and by falsely telling other law enforcement personnel that COLE and KINDLE needed bath salts to conduct legitimate HSI investigative work.

7. From in or about 2022 until in or about the beginning of 2024, COLE and KINDLE sold bath salts sporadically to an HSI Source of Information for thousands of dollars. In violation of their duties as HSI Special Agents, COLE and KINDLE permitted this source of information to use the bath salts and to resell the bath salts on the street and keep the profit. COLE and KINDLE did not investigate or arrest those to whom the source of information sold the bath salts.

## The Use of CI-1 to Further the Illegal Schemes

8. Beginning in or about March or April 2024, COLE recruited CI-1 to serve as new buyer for COLE's and KINDLE's illegal bath salts.

9. From in or about March or April 2024 until in or about October 2024, COLE and KINDLE sold CI-1 approximately twenty-five grams of bath salts at least once a week. COLE and KINDLE charged CI-1 approximately $5,000 for the twenty-five grams of bath salts during each illegal transaction.

10. COLE and KINDLE used Signal, an encrypted messaging application, to communicate with CI-1 about the details of where and when to meet CI-1 to conduct the illegal drug transactions.

11. COLE and KINDLE conspired together to arrange and conduct each drug transaction with CI-1, regardless of who conducted the actual transaction with CI-1.

12. On or about October 29, 2024, CI-1, through CI-1's attorney, began cooperating with the government to investigate COLE's and KINDLE's illegal activity.

<u>Recorded Drug Buy No. 1 – October 30, 2024</u>

13.     On or about October 30, 2024, KINDLE contacted CI-1 via Signal and provided CI-1 with details about when and where to meet to conduct an illegal drug transaction to take place that same day.

14.     KINDLE and CI-1 met at the prearranged location, located within the District of Utah. KINDLE invited CI-1 to sit inside KINDLE's car to conduct the transaction.

15.     KINDLE sold CI-1 approximately twenty-five grams of alpha-pyrrolidinohexanophenone (a/k/a Alpha-PHP or bath salts) for $5,000.

16.     KINDLE had hidden the illegal drugs inside a Styrofoam cup. Once CI-1 provided the $5,000 to KINDLE, KINDLE indicated that CI-1 should take the Styrofoam cup with the illegal drugs inside.

<u>Recorded Drug Buy No. 2 – November 6, 2024</u>

17.     On or about November 4, 2024, COLE contacted CI-1 via Signal and provided CI-1 with details about when and where to meet to conduct an illegal drug transaction on November 6, 2024.

18.     On or about November 6, 2024, COLE and CI-1 met at the prearranged location, located within the District of Utah. COLE invited CI-1 to sit inside COLE's vehicle to conduct the transaction.

19.     COLE sold CI-1 approximately twenty-five grams of alpha-pyrrolidinohexanophenone for $5,000.

## Recorded Drug Buy No. 3 – November 11, 2024

20.     On or about November 9, 2024, COLE contacted CI-1 via Signal and provided CI-1 with details about when and where to meet to conduct an illegal drug transaction on November 11, 2024.

21.     On or about November 11, 2024, COLE and CI-1 met at the prearranged location, located within the District of Utah. COLE invited CI-1 to sit inside COLE's vehicle to conduct the transaction.

22.     COLE sold CI-1 approximately twenty-five grams of alpha-pyrrolidinohexanophenone for $5,000.

23.     COLE also provided CI-1 with approximately ten grams of another white substance ("Substance 2") free of charge.

24.     COLE instructed CI-1 to test whether Substance 2 was viable to sell in the illegal drug market.

## Recorded Drug Buy No. 4 – November 14, 2024

25.     On or about November 13, 2024, COLE contacted CI-1 via Signal and provided CI-1 with details about when and where to meet to conduct an illegal drug transaction on November 14, 2024.

26.     Using Signal, COLE inquired about the quality of Substance 2. After CI-1 told COLE that Substance 2 was "ok," COLE asked CI-1 how much of Substance 2 CI-1 wanted. CI-1 informed COLE he would take twenty-five grams of Substance 2.

27.     On or about November 14, 2024, KINDLE drove to COLE's residence and dropped off a dark-colored bag which had approximately twenty-five grams of illegal bath salts and twenty-five grams of Substance 2 contained inside.

28. Later that same day, COLE drove to a Panera Bread located within the District of Utah, and using Signal, told CI-1 where to meet him inside the Panera Bread.

29. COLE sold CI-1 approximately twenty-five grams of alpha-pyrrolidinohexanophenone for $5,000.

30. COLE also provided twenty-five grams of Substance 2 to CI-1 free of charge.

<u>Recorded Drug Buy No. 5 – November 18, 2024</u>

31. On or about November 17, 2024, KINDLE contacted CI-1 via Signal and provided CI-1 with details about when and where to meet to conduct an illegal drug transaction on November 18, 2024.

32. On or about November 18, 2024, KINDLE and CI-1 met at the prearranged location, located within the District of Utah. KINDLE invited CI-1 to sit inside KINDLE's vehicle to conduct the transaction.

33. KINDLE sold CI-1 approximately twenty-five grams of alpha-pyrrolidinohexanophenone and twenty-five grams of Substance 2 for $7,500.

34. During the illegal drug transaction, KINDLE gestured to the back seat of his vehicle.

35. CI-1 retrieved a brown paper bag from the back seat of KINDLE's vehicle.

36. KINDLE had hidden the illegal drugs inside the brown paper bag.

37. CI-1 placed $5,000 of cash on the center console of KINDLE's vehicle and asked KINDLE, "right here?"

38. KINDLE picked up the $5,000 of cash and moved it to an area near the driver's side door.

Recorded Drug Buy No. 6 – November 21, 2024

39.    On or about November 20, 2024, KINDLE contacted CI-1 via Signal and provided CI-1 with details about when and where to meet to conduct an illegal drug transaction on November 21, 2024.

40.    On or about November 21, 2024, KINDLE and CI-1 met at the prearranged location, located within the District of Utah.

41.    KINDLE and CI-1 walked together in the parking lot of the prearranged meeting location. During the walk, KINDLE inquired about the quality of Substance 2 by saying, in sum and substance, "the new…it's good?"

42.    In response, CI-1 advised KINDLE that "people love it…it goes almost just as fast." KINDLE replied, in sum and substance, "that's good, man."

43.    KINDLE then advised CI-1 that the conspirators were running low on the original bath salts they had been selling to CI-1 by saying, in sum and substance, "the original…not really running into it…I have to check…we have a little bit."

44.    KINDLE then described where CI-1 could recover the illegal drugs KINDLE had brought with him by saying, in sum and substance, "so I put it in a trash can…in a Chick-Fil-A Styrofoam cup…one black glove has like three little baggies in there…that's the real, the original…the other one's the big old rocky shit."

45.    KINDLE then described the location of the trash can to CI-1 by saying, in sum and substance, "like in the middle of the parking lot, kind of…by that tree with the orange leaves…I don't think there's anything else in there."

46.     KINDLE then advised CI-1 how to avoid detection when he went to retrieve the drugs by saying, in sum and substance, "yeah, so it's under that...orange leaves...but, I would go say go grab a drink somewhere...and drive around."

47.     KINDLE and CI-1 then entered KINDLE's vehicle. KINDLE opened the center console of his vehicle. CI-1 placed $7,500 of cash into the center console and exited the vehicle.

48.     CI-1 retrieved the illegal drugs contained in the Chick-Fil-A cup hidden in a trash can as indicated by KINDLE.

### Recorded Drug Buy No. 7 – November 25, 2024

49.     On or about November 24, 2024, COLE contacted CI-1 via Signal and provided CI-1 with details about when and where to meet to conduct an illegal drug transaction on November 25, 2024.

50.     On or about November 25, 2024, COLE drove to a Panera Bread located within the District of Utah and met with CI-1.

51.     COLE sold CI-1 approximately twenty-five grams of alpha-pyrrolidinohexanophenone and twenty-five grams of Substance 2 for $7,500.

### Recorded Drug Buy No. 8 – December 2, 2024

52.     On or about November 30, 2024, COLE contacted CI-1 via Signal and provided CI-1 with details about when and where to meet to conduct an illegal drug transaction on December 2, 2024.

53.     On or about December 2, 2024, COLE and CI-1 met at the prearranged location within the District of Utah.

54.     On or about December 2, 2024, KINDLE was surveilling the area where COLE and CI-1 had agreed to meet.

55. COLE sold CI-1 approximately twenty-five grams of alpha-pyrrolidinohexanophenone and twenty-five grams of Substance 2 for $7,500.

56. During the illegal drug transaction, COLE advised CI-1 of a dead drop location where CI-1 could retrieve the illegal drugs.

57. CI-1 retrieved the illegal drugs from the dead drop location and left the meeting location.

58. KINDLE followed CI-1 as CI-1 left the meeting location.

59. Later on or about December 2, 2024, COLE contacted CI-1 and requested to meet with CI-1 at a new location within the District of Utah. CI-1 agreed.

60. When CI-1 arrived at the prearranged meeting location, COLE advised CI-1 that CI-1 had only retrieved one of the two packages from the dead drop location. COLE instructed CI-1 where to retrieve the second package. CI-1 retrieved the package and left the location.

### Summary of Illegal Drug Transactions

61. Between in or about April 2024 and in or about December 2024, COLE and KINDLE distributed and possessed with intent to distribute at least 891 grams of bath salts.

62. In or about November 2024, in furtherance of the scheme, **COLE** arranged to procure an additional 3 kilograms of N-Ethylhexedrone by falsely representing to an HSI Special Agent in Kentucky that **COLE** intended to use the N-Ethylhexedrone for legitimate HSI investigations.

63. COLE and KINDLE profited at least $195,000 through their illegal drug sales to CI-1. COLE and KINDLE also profited from their illegal drug sales to the aforementioned HSI Source of Information.

## Theft of HSI Evidence

64.     Between in or about 2021 and in or about 2024, on at least three occasions, COLE and KINDLE stole evidence that was meant to be seized by HSI as part of legitimate HSI investigations. This theft included thousands of dollars in cash, a diamond ring, and a Peruvian antiquity.

## Forfeiture

65.     Through their criminal conspiracies, COLE and KINDLE acquired at least the following:

  a. $195,000;

  b. One diamond ring; and

  c. One Peruvian antiquity.

## Conclusion

66.     COLE and KINDLE worked interdependently and conspired with each other to accomplish the objects of their conspiracies.


EDWARD P. SULLIVAN
Acting Chief, Public Integrity Section
U.S. Department of Justice

By: /s/ _[signature]_

ALEXANDER GOTTFRIED
BLAKE J. ELLISON
Trial Attorneys
Public Integrity Section
Criminal Division
U.S. Department of Justice

## DEFENDANT'S ACKNOWLEDGMENT

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me regarding this offense. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crime charged. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully.

I read every word of this Statement of Offense. Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorney, I agree and stipulate to this Statement of Offense, and declare under penalty of perjury that it is true and correct.

Date: _8·13·25_

_____
DAVID COLE
Defendant


## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of Offense and discussed it fully with my client, DAVID COLE. I concur with his decision to adopt and stipulate to this Statement of Offense as true and accurate.

Date: _8·13·25_

_____
ALEXANDER E. RAMOS
JAMIE Z. THOMAS
Attorneys for David Cole